**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------x

GOD, GOLD AND MOORE LLC, d/b/a     :
PSYCHO BUNNY,     :     Index No.    <u>12 Civ 8907</u>
    :
        Plaintiff,     :
    :     **ECF CASE**
    :
       v.     :
    :
NIKE, INC.     :     **DECLARATION OF**
and JOHN DOES 1-25,     :     **ROBERT GODLEY**
    :     **IN SUPPORT OF PLAINTIFF'S**
       Defendants.     :     **MOTION FOR A TEMPORARY**
    :     **RESTRAINING ORDER,**
    :     **PRELIMINARY INJUNCTION,**
    :     <u>**AND EXPEDITED DISCOVERY**</u>
    :
------------------------------------------------------x

      I, **ROBERT GODLEY**, declare under penalty of perjury pursuant to 28 U.S.C. § 1746

that the following it true and correct:

      1.      I am a founding Member of Plaintiff God, Gold and Moore LLC, d/b/a Psycho

Bunny ("God & Gold") and respectfully submit this Declaration in support of the application of

God & Gold for a temporary restraining order, preliminary injunction, and expedited discovery.

I am fully familiar with the facts and circumstances set forth herein. If called upon to testify, I

would testify competently to the matters set forth herein. This Affidavit is based upon my

personal knowledge and review of the relevant documents in this case, except where based upon

information and belief. As to those matters, I believe them to be true.

2.      My partner, Robert Goldman, and I developed the Psycho Bunny name and image logo in during Spring 2005 with our first collection of handmade neckties. The following year, we filed two applications with the United States Patent and Trademark Office ("USPTO") for trademark protection of the "Psycho Bunny" name and image we created.

3.      In or about 2007, Mr. Goldman and I formed RG2 LLC ("RG2") to operate as the holder of the then-pending Psycho Bunny trademark applications. RG2 granted God & Gold an exclusive license in the Psycho Bunny name and image for all lawful purposes. Annexed as Exhibit A is a true and correct copy of the exclusive license agreement.

4.      Since 2005, God & Gold has developed and marketed a brand of high-quality clothing, bags, and accessories using the Psycho Bunny name and image, including polo and other shirts. Although we do not currently manufacture and market our shirts as such, God & Gold intends to expand its product line into the athletic active-wear market. Annexed as Exhibit B is a true and correct copy of Nike's webpage advertising the Sinister Hare shirt as active-wear.

5.      God & Gold has sold and presently sells its goods through its website (www.psycho-bunny.com) as well as in retail establishments throughout the United States, Latin America, Asia, and Europe, including through Nordstrom, Neiman Marcus, Barneys New York, and other well-known proprietors.

6.      On or about February 16, 2010, the United States Patent and Trademark Office ("USPTO") granted the trademark application for the word mark "Psycho Bunny" ("Word Mark"). The Registration Number for the Word Mark is 3750802; the International Registration Number is 0983842. The Word Mark covers the following:

## Psycho Bunny

Annexed as Exhibit C is a true and correct copy of the USPTO Registration Certificate for the Psycho Bunny Word Mark.

7.   On or about May 18, 2010, the USPTO granted the trademark application for the Psycho Bunny image ("Image Mark").  The Registration Number for the Image Mark is 3790282; the International Registration Number is 0983667.  The Image Mark is registered in International Class 25 on goods including: "Bow ties; Canvas shoes; Dress shirts; Golf Shirts; Leather shoes; Polo shirts; Running shoes; Sandals; Shirts; Shirts for suits; Short-sleeved or long-sleeved t-shirts; Short-sleeved shirts; Sport shirts; Sweat shirts; T-shirts; Ties; Track and field shoes; Training shoes."   The Image Mark is described in the Registration Certificate as follows: "The mark consists of [a] stylized skull with rabbit ears and two buck-teeth over two stylized crossed bones."  The Image Mark appears in the Registration Certificate as follows:



Annexed as Exhibit D is a true and correct copy of the Registration Certificate for the Psycho Bunny Image Mark (collectively with the Psycho Bunny Word Mark, "Trademarks").

8.     God & Gold has devoted substantial time, effort, and money to create, market, promote, and sell its apparel and accessories featuring the Trademarks. God & Gold has expended hundreds of thousands of dollars in connection with publicizing and promoting designs bearing or featuring the Trademarks.

9.     The Psycho Bunny brand has been publicly worn by celebrities and famous athletes such as actors Jim Carey and Ken Jeong, singer Joe Jonas, hip-hop producer Swizz Beats, New York Yankees third-baseman Alex Rodriguez, New York Giants defensive end Osi Umenyiora, New York Red Bulls striker Thierry Henry, Los Angeles Lakers point guard Steve Nash, and Miami Heat guard Dwayne Wade, among others.

10.    As a result of widespread advertising, publicity, promotion, and offering for sale of products bearing the Trademarks, the Trademarks have become well-known and, I believe, famous symbols of quality and source identifiers to those in the trade and in the minds of the purchasing public. The Trademarks are identifiers of high-quality products from Psycho Bunny and as such have become highly valuable.

B.     Defendants Unlawful Use Of The Trademarks

11.    In or about February 2012, God & Gold became aware of a line of "Sinister Hare" shirts manufactured by Nike, Inc. ("Nike") through customer comments on God & Gold's social media website. Specifically, God & Gold received comments through its Facebook site and, later, from sales representatives in retail stores inquiring as to whether it had created a new logo or licensed and/or launched a joint-venture with respect the Sinister Hare shits. The customer and retailer comments reveal that the consuming public is confused about the origin of the Sinister Hare shirts and its relationship to Plaintiff. Annexed as Exhibit E are true and correct copies of customer e-mails.

12.     Upon information and belief and at all times relevant hereto, Defendants had knowledge of RG2's ownership of the Trademarks, including its exclusive right to use and license them and the goodwill associated therewith.

13.     Upon information and belief, Nike has manufactured and/or caused to be manufactured and has imported, promoted, advertised, distributed, sold, and/or offered for sale the "Sinister Hare" shirts both in brick-and-mortar stores as well as through its website reaching into the same markets where God & Gold's merchandise is sold.

14.     Upon information and belief, Nike has provided "Sinister Hare" shirts on a wholesale basis to defendants John Does 1-25, who have sold and continue to sell the shirts through their websites and brick-and-mortar retail stores.

15.     Upon information and belief, Defendants have been conducting and/or continue to conduct their infringing activities at least within this District and elsewhere throughout the United States.

16.     Defendants' use of the infringing "Sinister Hare" image and name, including the manufacture, importation, promotion and advertising, distribution, sale, and/or offering for sale of the infringing "Sinister Hare" shirts is without God & Gold's consent or authorization. Neither of the Trademarks have ever been assigned or licensed to Defendants.

17.     Upon information and belief, neither Nike nor John Does 1-25 have filed for a trademark application on either the "Sinister Hare" image or name.

18.     Upon information and belief, Defendants have been and/or are engaging in the above-described illegal activities willfully, knowingly, and intentionally, or with reckless disregard or willful blindness to God & Gold's rights for the purpose of trading on the goodwill and reputation of God & Gold.

### C.     <u>Nike Refused To Cease And Desist Selling Sinister Hare Shirts.</u>

19.     On or about June 7, 2012, God & Gold, by and through counsel, sent Nike a cease-and-desist letter ("June 7 Letter"). God & Gold demanded that, owing to the substantial similarity between the Trademarks and Nike's Sinister Hare name and image and the consequent threat posed to God & Gold's business and Trademarks, Nike immediately cease and desist all use of the Sinister Hare name and image.

20.     God & Gold further demanded that Nike deliver-up for destruction all material and products to which the "Sinister Hare" name or image has been applied, withdraw, cancel, and/or delete any corporate names, domain names, trademark applications, and/or trademark registrations for or including the "Sinister Hare" name or image, and undertake, in writing, never in the future to make any use of the "Sinister Hare" name or image, or any other image similar to the Trademarks absent prior written authority from God & Gold. Annexed as Exhibit F is a true and correct copy of the June 7 Letter.

21.     On or about July 3, 2012, Nike responded to the June 7 Letter by rejecting the cease-and-desist demand. Annexed as Exhibit G is a true and correct copy of Nike's July 3, 2012 letter.

22.     On or about July 6, 2012, God & Gold, by and through counsel, renewed its demand that Nike cease-and-desist from using the "Sinister Hare" name and image and from marketing and selling the "Sinister Hare" line of shirts ("July 6 Letter"). Annexed as Exhibit H is a true and correct copy of the July 6 Letter.

23.     On or about August 6, 2012, Nike again rejected God & Gold's demands. Annexed as Exhibit I is a true and correct copy of Nike's August 6, 2012 letter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __3__ day of December 2012.

_R. Godley_

Robert Godley

## Trademark License Agreement

This Trademark License Agreement ("**Agreement**"), dated as of _March 30, 2012_ is by and between RG2 LLC, a New Jersey limited liability company (the "**Licensor**") and God, Gold & Moore LLC, a New Jersey limited liability company (the "**Licensee**").

WHEREAS, Licensor is the owner of the Marks (as defined below); and

WHEREAS, Licensee wishes to use the Marks in connection with the Licensed Products (as defined below) and Licensor is willing to grant to Licensee a license to use the Marks on the terms and conditions set out in this agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

"**Action**" has the meaning set forth in **Section 11.1**.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Confidential Information**" has the meaning set forth in **Section 9.1(a)**.

"**Earned Royalties**" has the meaning set forth in **Section 8.1**.

"**Effective Date**" means the date of this Agreement as set forth in the preamble.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any federal, state, local or foreign government or political subdivision thereof, or any arbitrator, court or tribunal of competent jurisdiction.

**"Licensed Products"** means the products listed in Schedule 1 and any other products that may be agreed upon in writing by Licensor and Licensee from time to time.

**"Licensee"** has the meaning set forth in the preamble.

**"Licensor"** has the meaning set forth in the preamble.

**"Losses"** means losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

**"Marks"** means the trademark set forth on Schedule 1 whether registered or unregistered, including the listed registrations and applications and any registrations which may be granted pursuant to such applications.

**"Net Sales Price"** means the gross invoiced price for each sale of a Licensed Product in an arm's length transaction, less, to the extent separately identified on the invoice, any costs of packing, insurance, transport, delivery, customary and usual trade discounts, sales taxes, freight and duty charges; provided that where the Licensed Products are: (i) sold or otherwise distributed other than in an arm's length transaction, or (ii) sold or otherwise distributed to any Affiliate of Licensee, the Net Sales Price of each such Licensed Product shall be deemed to be the Net Sales Price which would have been applied under this Agreement, had such Licensed Product been transferred to an independent arm's length customer.

**"Person"** means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity.

**"Quarterly Period"** means each three-month period commencing on the 1st of January, 1st of April, 1st of July and 1st of October.

**"Sell-Off Period"** has the meaning given to it in **Section 14.2**.

**"Term"** has the meaning given to it in **Section 13.1**.

2. <u>License</u>.

2.1 <u>License Grant</u>. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee during the Term an exclusive, non-transferable (except as provided in **Section 12**), license to use the Marks on or in connection with the manufacture, promotion, advertising, distribution and sale of Licensed Products world-wide and to enforce all rights related to the Marks, including to right to collect past damages for infringement of the Marks.

2.2 <u>Business Names and Domain Names</u>. Without Licensor's prior written consent, Licensee shall not use the Marks (or any mark confusingly similar thereto), individually or in combination, as part of:

    (a)  its corporate or trade name; or

    (b)  any domain name.

2.3 <u>Sublicensing</u>. Licensee shall have the right to grant to any Person a sublicense of any of its rights under this Agreement, provided that:

    (a)  Licensee obtains the prior written consent of Licensor, such consent not to be unreasonably withheld;

    (b)  the terms of any sublicense are in writing, in a form and substance reasonably satisfactory to Licensor and, which are substantially the same as the terms of this Agreement (except that the sublicensee shall not have the right to sublicense its rights) and Licensee shall provide Licensor with a copy of the sublicense on request/any sublicensee first enters into a supplemental written agreement direct with Licensor in a form satisfactory to Licensor;

    (c)  each sublicense terminates automatically on termination or expiration of this Agreement;

    (d)  Licensee is responsible for any breaches of this Agreement caused by any sublicensee; and

    (e)  an act or omission of the sublicensee that would be a material breach of this Agreement if performed by Licensee shall be deemed to be a material breach by Licensee of this Agreement.

2.4 <u>Reservation of Rights</u>. Licensor expressly reserves all rights not expressly granted to Licensee under this Agreement.

3. <u>Use of the Marks</u>.

3.1 <u>Compliance With Licensor's Directions</u>. All Licensed Products made, sold or otherwise distributed by Licensee shall carry the Marks. Licensee shall comply strictly with the directions of Licensor regarding the form and manner of the application of the Marks.

3.2 <u>Trademark Notices</u>. Licensee shall ensure that all Licensed Products sold by Licensee and all related quotations, specifications and descriptive literature, and all other materials carrying the Marks, be marked with the appropriate trademark notices in accordance with Licensor's instructions.

## 4. Ownership and Registration.

**4.1 Acknowledgement of Ownership.** Licensee acknowledges that Licensor is the owner of the Marks throughout the world. Any goodwill derived from the use by Licensee of the Marks shall inure to the benefit of Licensor. If Licensee acquires any rights in the Marks, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to Licensor without further action by any of the parties. Licensee agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to the Marks or the validity of the Marks.

**4.2 Licensee Restrictions.** Licensee agrees that it shall not, during the Term or thereafter, directly or indirectly:

(a) do, omit to do, or permit to be done, any act which will or may dilute the Marks or tarnish or bring into disrepute the reputation of or goodwill associated with the Marks or Licensor or which will or may invalidate or jeopardize any registration of the Marks; or

(b) apply for, or obtain, or assist any Person in applying for or obtaining any registration of the Marks, or any trademark, service mark, trade name or other indicia confusingly similar to the Marks.

**4.3 Maintenance of Registrations.** Licensor shall at its own expense take all reasonable steps to maintain the existing registrations of the Marks and prosecute to registration any pending applications for so long as the Marks is being used in commerce as required by applicable Law. Licensee shall provide, at the request of Licensor and at Licensee's expense, all necessary assistance with such maintenance and prosecution. Licensor shall provide to Licensee upon request copies of receipts of renewal fees.

**4.4 No Encumbrances.** Licensee shall not grant or attempt to grant a security interest in, or otherwise encumber, the Marks or record any such security interest or encumbrance against any application or registration regarding the mark in the United States Patent and Trademark Office or elsewhere.

**4.5 Recordation of License.** Licensee shall, at its own cost, promptly record the license granted to it in **Section 2.1** in the relevant trademark registries. Licensor shall provide reasonable assistance, at Licensee's cost, to enable Licensee to comply with this **Section 4.5.**

## 5. Quality Control.

**5.1 Acknowledgement.** Licensee acknowledges and is familiar with the high standards, quality, style and image of Licensor, and Licensee shall, at all times, conduct its business and use the Marks in a manner consistent with these standards, quality, style and image.

5.2 <u>Compliance With Licensor Specifications</u>. Licensee shall comply with the specifications, standards and directions relating to the Licensed Products, including their design, manufacture, promotion, packaging, distribution and sale, as notified in writing by Licensor from time to time.

5.3 <u>Compliance With Laws</u>. In exercising its rights under this Agreement, Licensee shall comply with, and shall ensure that each Licensed Product sold or otherwise supplied by Licensee complies with, all applicable Laws. Licensee shall promptly provide Licensor with copies of all communications, relating to the Marks or the Licensed Products, with any governmental, regulatory or industry authority.

5.4 <u>Inspection of Facilities</u>. Licensee shall permit, and shall use its best efforts to obtain permission for, Licensor at all reasonable times and on reasonable notice to enter any place used for the manufacture, storage or distribution of the Licensed Products to inspect the methods of manufacture, storage and distribution to ensure compliance with the quality standards or any other specifications or requirements set forth in this Agreement.

5.5 <u>Submission of Materials for Approval</u>. Licensee shall, at its own expense, prior to any use of the Marks and thereafter at least once in every six months and at any time at Licensor's written request supply a reasonable number of production samples of the Licensed Products to Licensor for approval, which may be given or withheld in Licensor's sole discretion. In the event that Licensor rejects any sample, it shall give written notice of such rejection to Licensee within 30 days of receipt by Licensor of the sample. Licensee shall immediately cease distribution of such Licensed Products and shall not recommence distribution until Licensor confirms in writing that it may do so. In the absence of a written notice of rejection, within 30 days of receipt of a sample, the sample shall be deemed to have been approved by Licensor.

5.6 <u>Rejected, Damaged or Defective Products</u>. Licensee shall not sell, market, distribute or use for any purpose, or permit any third party to sell, market, distribute or use for any purpose, any Licensed Products which are rejected by Licensor pursuant to Section 5.5, or which are damaged or defective.

5.7 <u>Complaints</u>. Licensee shall promptly, upon Licensor's request, provide Licensor with details of any complaints it has received relating to the Licensed Products together with reports on the manner in which such complaints are being, or have been, dealt with and shall comply with any reasonable directions given by Licensor in respect thereof.

5.8 <u>Subcontracting</u>. Licensee shall have the right to subcontract some, but not all, of the manufacture of the Licensed Products, provided that in doing so no know-how relating to the manufacture of the Licensed Products, or other confidential information of Licensor, is disclosed to any subcontractor.

6. <u>Marketing, Advertising and Promotion</u>.

6.1 <u>Marketing and Advertising Requirements</u>. Licensee shall:

(a) use its best efforts to promote and expand the supply of Licensed Products;

(b) provide such advertising and publicity as may reasonably be expected to bring the Licensed Products to the attention of as many purchasers and potential purchasers as possible; and

(c) ensure that its advertising, marketing and promotion of the Licensed Products in no way reduces or diminishes the reputation, image and prestige of the Marks or of products sold under or by reference to the Marks (including, without limitation, the Licensed Products).

6.2 <u>Approval of Marketing and Advertising Materials</u>. Licensee shall send to Licensor for its prior written approval the text and layout of all proposed advertisements and marketing and promotional material relating to the Licensed Products. In the event that Licensor disapproves of such material, it shall give written notice of such disapproval to Licensee within 14 days of receipt by Licensor of the material. In the absence of a written notice of disapproval within 14 days of receipt of such materials, the materials shall be deemed to have been approved by Licensor. Licensee shall not use any material in the advertising, marketing or promotion of Licensed Products that has not been approved by Licensor.

6.3 <u>Cost of Marketing and Advertising</u>. Licensee shall bear the costs of all advertising, marketing and promotion for the Licensed Products.

7. <u>Protection of the Marks</u>.

7.1 <u>Notification</u>. Each Party shall immediately notify the other in writing giving reasonable detail if any of the following matters come to its attention:

(a) any actual, suspected or threatened infringement of the Marks;

(b) any actual, suspected or threatened claim that the Marks is invalid;

(c) any actual, suspected or threatened opposition to the Marks;

(d) any actual, suspected or threatened claim that use of the Marks infringes the rights of any third party;

(e) any person applies for, or is granted, a registered trademark by reason of which that person may be, or has been, granted rights which conflict with any of the rights granted to Licensee under this Agreement; or

(f) any other actual, suspected or threatened claim to which the Marks may be subject.

7.2 <u>Actions</u>. With respect to any of the matters listed in **Section 7.1**:

(a) Licensee shall decide, in its sole discretion, what action if any to take;

(b) Licensee shall have exclusive control over, and conduct of, all claims and proceedings;

(c) Licensor shall provide Licensee with all assistance that Licensee may reasonably require in the conduct of any claims or proceedings; and

(d) Licensee shall bear the cost of any proceedings and shall be entitled to retain all sums recovered in any action for its own account.

8. <u>Royalties and Payment Terms</u>.

8.1 <u>Earned Royalties</u>. Licensee shall pay to Licensor a royalty (the **"Earned Royalty"**) of 1% of the Net Sales Price of each Licensed Product that is:

(a) sold or distributed by Licensee;

(b) supplied by Licensee to any person otherwise than in **Section 8.1(a)**; or

(c) put into use by Licensee;

in each case, provided that with respect to any Licensed Product sold or distributed or otherwise used or supplied only a single royalty shall be payable, and the royalty accrues on the date when the Licensed Product is used or supplied, the date it is supplied being the earliest of when it is invoiced, paid for, installed or delivered.

8.2 <u>Taxes</u>. Royalties and other sums payable under this Agreement are exclusive of taxes including Value Added Tax (or similar tax) and shall be paid free and clear of all deductions and withholdings whatsoever, unless the deduction or withholding is required by law. If any deduction or withholding is required by law, Licensee shall pay to Licensor such sum as will, after the deduction or withholding has been made, leave Licensor with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding. If Licensee is required by law to make a deduction or withholding, Licensee shall, within five business days of making the deduction or withholding, provide a statement in writing showing the gross amount of the payment, the amount of the sum deducted and the actual amount paid.

8.3 <u>Manner of Payment</u>. Royalties and any other sums payable under this Agreement shall be paid within 30 days of the end of each successive Quarterly Period in US dollars by wire transfer to a bank account to be designated in writing by Licensor.

8.4 <u>Late Payments</u>. In the event payments due under this Agreement are not received by Licensor by the due date, Licensee shall pay to Licensor interest on the overdue payment from the date such payment was due to the date of actual payment at a rate of 1.5% per month, or if lower, the maximum amount permitted under Law.

8.5 <u>Royalty Statements</u>. At the same time as payment of royalties are submitted, Licensee shall submit or cause to be submitted to Licensor a statement in writing, certified to be true and correct by Licensee's Chief Executive Officer that includes all information relevant to the calculation of such royalties, including:

    (a)   the Quarterly Period for which the royalties were calculated;

    (b)   the number of Licensed Products sold or distributed during the Quarterly Period;

    (c)   the number of Licensed Products manufactured during the Quarterly Period but not yet sold or distributed;

    (d)   the Net Sales Price of each Licensed Product sold or distributed during the Quarterly Period;

    (e)   the amount of royalties due and payable;

    (f)   the amount of any withholding or other income taxes deductible or due to be deducted from the amount of royalties due and payable; and

    (g)   any other details Licensor may reasonably require.

Within 30 days of the end of each calendar year, Licensee shall submit to Licensor a written statement certified by Licensee's auditors of the aggregate Net Sales Price of Licensed Products manufactured, sold or distributed by Licensee in that year and the amount due to be paid for that year under this Section 8. In the event that such statement shows that the amount due by Licensee is less than the amount paid, Licensee shall pay to Licensor within 14 days of the submission of the statement an amount equivalent to the difference between the amount paid and the amount due, plus any interest calculated in accordance with **Section 8.4**

8.6 <u>Audit Right</u>. Licensee shall keep complete and accurate books and records showing the description price, quantity and date of manufacture and sale of all Licensed Products manufactured, sold or distributed. Such books and records shall be kept separate from any books and records not relating solely to the Licensed Products and be available

during normal business hours for inspection and audit by Licensor (or its authorized representative), who shall be entitled to take copies of or extracts from the same. If such inspection or audit should reveal a discrepancy in the royalties paid from those payable under this Agreement, Licensee shall immediately make up the shortfall, including interest calculated in accordance with **Section 8.4** and reimburse Licensor for any professional charges incurred for such audit or inspection. Such inspection and audit right of Licensor shall remain in effect for a period of one year after the termination of this Agreement.

9. <u>Confidentiality</u>.

    9.1 <u>Licensee Obligations</u>. Licensee agrees:

        (a) not to disclose or otherwise make available to any third party any information that is treated as confidential by Licensor, including, without limitation, trade secrets, technology, information pertaining to business operations and strategies, and information pertaining to customers, pricing, and marketing (collectively, the **"Confidential Information"**) without the prior written consent of Licensor; *provided, however,* that Licensee may disclose the Confidential Information to its officers, employees, consultants and legal advisors who have a "need to know", who have been apprised of this restriction and who are themselves bound by nondisclosure restrictions at least as restrictive as those set forth in this **Section 9**;

        (b) to use the Confidential Information as permitted under this Agreement; and

        (c) to notify Licensor in the event it becomes aware of any loss or disclosure of any Confidential Information.

    9.2 <u>Exceptions</u>. Confidential Information shall not include information that:

        (a) is already known to Licensee without restriction on use or disclosure prior to receipt of such information from Licensor;

        (b) is or becomes generally known by the public other than by breach of this Agreement by, or other wrongful act of, Licensor;

        (c) is received by Licensee from a third party who is not under any obligation to Licensor to maintain the confidentiality of such information; or

        (d) is required to be disclosed by Law, including without limitation, pursuant to the terms of a court order; *provided, that* Licensee has given Licensor prior written notice of such disclosure and an opportunity to contest such disclosure.

    It shall be the obligation of Licensee to prove that such an exception to the definition of Confidential Information exists.

10. <u>Representations and Warranties</u>.

10.1 <u>Mutual Representations and Warranties</u>. Each party represents and warrants to the other party that:

(a) it is duly organized, validly existing and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization or chartering;

(b) (i) it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted hereunder and to perform its obligations hereunder, and (ii) the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of the party; and

(c) when executed and delivered by such party, this Agreement will constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

10.2 <u>Disclaimer of Representations and Warranties</u>. Nothing in this Agreement shall constitute any representation or warranty by Licensor that:

(a) any Marks is valid;

(b) any Marks (if an application) shall proceed to grant or, if granted, shall be valid; or

(c) the exercise by Licensee of rights granted under this Agreement will not infringe the rights of any person.

10.3 <u>Exclusion of Consequential and Other Indirect Damages</u>. To the fullest extent permitted by Law, Licensor shall not be liable to Licensee for any consequential, incidental, indirect, exemplary, special or punitive damages whether arising out of breach of contract, tort (including negligence) or otherwise, regardless of whether such damage was foreseeable and whether or not Licensee has been advised of the possibility of such damages.

11. <u>Indemnity and Insurance</u>.

11.1 <u>Indemnity</u>. Licensee shall indemnify, defend and hold harmless Licensor against all Losses arising out of or resulting from any third party claim, suit, action or proceeding (each, an **"Action"**) related to or arising out of: (a) the breach of this Agreement by Licensee, and (b) Licensee's exercise of its rights granted under this Agreement, including but not limited to any product liability claim or third party intellectual property

rights infringement claim relating to Licensed Products manufactured, supplied or put into use by Licensee.

11.2 Indemnification Procedures. The indemnified party shall promptly notify the indemnifying party in writing of any Action and cooperate with the indemnifying party at the indemnifying party's sole cost and expense. The indemnifying party shall immediately take control of the defense and investigation of such Action and shall employ counsel of its choice to handle and defend the same, at the indemnifying party's sole cost and expense. The indemnifying party shall not settle any Action in a manner that adversely affects the rights of the indemnified party without the indemnified party's prior written consent, which shall not be unreasonably withheld or delayed. The indemnified party's failure to perform any obligations under this Section 11.2 shall not relieve the indemnifying party of its obligations under this Section 11.2 except to the extent that the indemnifying party can demonstrate that it has been materially prejudiced as a result of such failure. The indemnified party may participate in and observe the proceedings at its own cost and expense.

11.3 Insurance.

(a) At all times during the Term of this Agreement and for a period of three years thereafter, Licensee shall procure and maintain, at its sole cost and expense commercial general liability insurance with limits no less than $100,000 per occurrence and $500,000 in the aggregate, including bodily injury and property damage and products and completed operations and advertising liability, which policy will include contractual liability coverage insuring the activities of Licensee under this Agreement.

(b) All insurance policies required pursuant to Section 11.3 shall:

(i) be issued by insurance companies reasonably acceptable to Licensor;

(ii) provide that such insurance carriers give Licensor at least 30 days' prior written notice of cancellation or non-renewal of policy coverage; *provided that,* prior to such cancellation, Licensee shall have new insurance policies in place that meet the requirements of Section 11.3;

(iii) waive any right of subrogation of the insurers against Licensor;

(iv) provide that such insurance be primary insurance and any similar insurance in the name of and/or for the benefit of Licensor shall be excess and non-contributory; and

(v) name Licensor, including, in each case, all successors and permitted assigns, as additional insureds.

(c)   Licensee shall provide Licensor with copies of the certificates of insurance and policy endorsements required by this **Section 11.3** upon the written request of Licensor, and shall not do anything to invalidate such insurance.

12. <u>Assignment</u>.  Licensee shall not assign or otherwise transfer any of its rights, or delegate or otherwise transfer any of its obligations or performance, under this Agreement, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without Licensor's prior written consent, which consent Licensor shall not unreasonably withhold or delay. No delegation or other transfer will relieve Licensee of any of its obligations or performance under this Agreement. Any purported assignment, delegation or transfer in violation of this **Section 12** is void. Licensor may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement without Licensee's consent. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective permitted successors and assigns.

13. <u>Term and Termination</u>.

13.1 <u>Term</u>. This Agreement shall be deemed to have commenced as of the Effective Date and, unless terminated earlier in accordance with **Section 13.2**, shall remain in force for a period of 5 years (the "**Term**").

13.2 <u>Termination for Cause</u>. Licensor shall have the right to terminate this Agreement immediately by giving written notice to Licensee if:

(a)   Licensee fails to pay any amount due under this Agreement on the due date for payment and remains in default not less than 14 days after being notified in writing to make such payment;

(b)   Licensee breaches this Agreement (other than failure to pay any amounts due under this Agreement) and (if such breach is curable) fails to cure such breach within 30 days of being notified in writing to do so;

(c)   (i) becomes insolvent or admits its inability to pay its debts generally as they become due; (ii) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven business days or is not dismissed or vacated within 45 days after filing; (iii) is dissolved or liquidated or takes any corporate action for such purpose; (iv) makes a general assignment for the benefit of creditors; or (v) has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business;

(d)   Licensee challenges the validity or Licensor's ownership of the Marks; or

(e)   there is a change in control of Licensee.

14. Post-termination Rights and Obligations.

14.1 Effect of Termination. On expiration or termination of this Agreement for any reason and subject to any express provisions set out elsewhere in this Agreement:

(a) all outstanding amounts payable by Licensee to Licensor shall immediately become due and payable;

(b) all rights and licenses granted pursuant to this Agreement shall cease;

(c) Licensee shall cease all use of the Marks except as expressly permitted pursuant to Section 14.2;

(d) Licensee shall promptly return to Licensor, or, at Licensor's option, destroy, at Licensee's expense, all records and copies of technical and promotional material in its possession relating to the Licensed Products, and of any Confidential Information of Licensor and all copies thereof; and

(e) within 90 days after the date of expiration or termination, Licensee shall promptly deliver to Licensor or any other person designated by Licensor, or at Licensor's option, destroy, at Licensor's expense, all Licensed Products that it has not disposed of within 60 days after the date of expiration or termination in accordance with Section 14.2.

14.2 Sell-off Period. On expiration or termination of this Agreement for any reason other than termination by Licensor pursuant to Section 13.2, Licensee shall for a period of 60 days after the date of termination have the right to dispose of all stocks of Licensed Products in its possession and all Licensed Products in the course of manufacture at the date of termination, in each case, in accordance with the terms and conditions of this Agreement, and, provided, that any royalty payable under the provisions of Section 8 (as if such stocks were supplied at the date of termination) is paid to Licensor within 30 days after termination.

14.3 Surviving Rights. Any rights or obligations of the parties in this Agreement which, by their nature, should survive termination or expiration of this Agreement will survive any such termination or expiration, including the rights and obligation set forth in this Section 14.3 and Section 1, Section 4.1, Section 4.2, Section 8, Section 9, Section 10, Section 11, Section 12, Section 14, and Section 15.

15. Miscellaneous.

15.1 Further Assurances. Each party shall, upon the reasonable request, and at the sole cost and expense, of the other party, execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement.

15.2 <u>Relationship of the Parties</u>. The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever.

15.3 <u>Public Announcements</u>. Neither party shall issue or release any announcement, statement, press release or other publicity or marketing materials relating to this Agreement, or, unless expressly permitted under this Agreement, otherwise use the other party's trademarks, service marks, trade names, logos, symbols or brand names, in each case, without the prior written consent of the other party.

15.4 <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 15.4**.

If to Licensor:

> RG2 LLC
> 15 West 26th Street, 4th Floor
> New York, New York 10010
>
> Facsimile: 212-532-8669
>
> Attention: Robert Goldman

If to Licensee:

> God, Gold & Moore LLC
> 15 West 26th Street, 4th Floor
> New York, New York 10010
>
> Facsimile: 212-532-8669
>
> Attention: Robert Goldman

15.5 <u>Interpretation</u>. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (i) to Sections, Schedules and Exhibits refer to the Sections of, and Schedules and Exhibits attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

15.6 <u>Entire Agreement</u>. This Agreement, together with all Schedules and Exhibits and any other documents incorporated herein by reference, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.7 <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

15.8 <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

15.9 <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

15.10      <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render

unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

15.11    <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of New Jersey. Any legal suit, action or proceeding arising out of or related to this Agreement or the Services provided hereunder shall be instituted exclusively in the federal courts of the United States or the courts of the State of New Jersey, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court.

15.12    <u>Equitable Relief</u>. Licensee acknowledges that a breach by Licensee of this Agreement may cause Licensor irreparable damages, for which an award of damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, Licensor will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court, in addition to any other remedy to which Licensor may be entitled at law or in equity. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

15.13    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile[, e-mail or other means of electronic transmission] shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.


[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

RG2 LLC

By _____

Name: _____
Title: _____

God, Gold & Moore LLC

By _____

Name: **ROBERT GOOLEY**
Title: **PARTNER** .

## SCHEDULES AND EXHIBITS

## SCHEDULE 1

## EXHIBIT A

## LICENSED PRODUCTS

Apparel
Accessories

**EXHIBIT B**

**MARKS**

Psycho Bunny



# EXHIBIT C

# TRADEMARK NOTICES



Exhibit C



United States Patent and Trademark Office

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

**Trademarks > Trademark Electronic Search System (TESS)**

*TESS was last updated on Fri Nov 30 05:02:46 EST 2012*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | CURR LIST |
| LAST DOC | | | | | | | | NEXT DOC |

**Logout** Please logout when you are done to release system resources allocated for you.

**Start** **List At:** OR **Jump** to record: Record 1 out of 2

| TSDR | ASSIGN Status | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# Psycho Bunny

**Word Mark** PSYCHO BUNNY
**Goods and Services** IC 025. US 022 039. G & S: Golf shirts; Polo shirts; Scarves; Shirts; Ties. FIRST USE: 20070131. FIRST USE IN COMMERCE: 20070131
**Standard Characters Claimed**
**Mark Drawing Code** (4) STANDARD CHARACTER MARK
**Serial Number** 78934154
**Filing Date** July 20, 2006
**Current Basis** 1A
**Original Filing Basis** 1B

Trademark Electronic Search System (TESS)

| | |
|---|---|
| **Published for Opposition** | January 16, 2007 |
| **Registration Number** | 3750802 |
| **International Registration Number** | 0983342 |
| **Registration Date** | February 16, 2010 |
| **Owner** | (REGISTRANT) RG2 LLC LIMITED LIABILITY COMPANY NEW JERSEY 120 LITTLE STREET BELLEVILLE NEW JERSEY 07109 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Donna A. Tobin |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | | CURR LIST |
|---|---|---|---|---|---|---|---|---|---|

| LAST DOC | | | | | | | | | NEXT DOC |
|---|---|---|---|---|---|---|---|---|---|

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

D

United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Fri Nov 30 05:02:46 EST 2012*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | CURR LIST | FIRST DOC | PREV DOC

**Logout**  Please logout when you are done to release system resources allocated for you.

**Start** | **List At:**   OR  **Jump** to record:    **Record 2 out of 2**

TSDR | ASSIGN Status | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



**Goods and Services**  IC 025. US 022 039. G & S: Bow ties; Canvas shoes; Dress shirts; Golf shirts; Leather shoes; Polo shirts; Running shoes; Sandals; Shirts; Shirts for suits; Short-sleeved or long-sleeved t-shirts; Short-sleeved shirts; Sport shirts; Sweat shirts; T-shirts; Tees ; Track and field shoes; Training shoes. FIRST USE: 20060717. FIRST USE IN COMMERCE: 20060717

**Mark Drawing Code**  (2) DESIGN ONLY

**Design Search Code**  02.11.10 - Bones, human; Human skeletons, parts of skeletons, bones, skulls; Skulls, human
03.09.01 - Bunnies; Hares; Rabbits
03.09.24 - Stylized small mammals, rodents, kangaroos, wallabies
26.11.21 - Rectangles that are completely or partially shaded

**Trademark Search
Facility Classification**  ANI-MAMM Mammalia;accurate depiction of warm-blooded animals except for human beings
GROT-ANI Exaggerated depiction of an animal



**Code**  HUM Accurate representation of a human form, or any portion of a human form
SHAPES-GEOMETRIC Geometric figures and solids including squares, rectangles, quadrilaterals and polygons

**Serial Number**  78931437

**Filing Date**  July 17, 2006

**Current Basis**  1A

**Original Filing Basis**  1A;1B

**Published for Opposition**  July 10, 2007

**Registration Number**  3790282

**International Registration Number**  0983667

**Registration Date**  May 18, 2010

**Owner**  (REGISTRANT) RG2 LLC LIMITED LIABILITY COMPANY NEW JERSEY 120 LITTLE STREET BELLEVILLE NEW JERSEY 07109

**Assignment Recorded**  ASSIGNMENT RECORDED

**Attorney of Record**  Oren J. Warshavsky

**Description of Mark**  Color is not claimed as a feature of the mark. The mark consists of A stylized skull with rabbit ears and two buck-teeth over two stylized crossed bones. .

**Type of Mark**  TRADEMARK

**Register**  PRINCIPAL

**Live/Dead Indicator**  LIVE

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | | CURR LIST | FIRST DOC | PREV DOC |

**From:** G███████ C█ ◄───── █████████@yahoo.com> 🔗
**Subject:** Nike is ripping your logo
**Date:** May 12, 2012 6:41:24 PM EDT
**To:** Robert Godley <████████@me.com>, Robert Godley
◄─ ██████████@godandgold.com>

1 Attachment, 2.4 MB

Did you see this? Saw this shirt in Nike store today. It's everywhere





**Psycho Bunny** **Timeline** **2012**

The Best of Westchester ...

**Beauty & Style**

# sizzling-hot hues

Like · Comment · Share

4

**Psycho Bunny**

June 24

Hey, saw one of your shirts on someone coming to the Big Slick KC poker tourney yesterday when I was checking people in and he told me about your company........you should know.....Nike has totally copied your concept and made a shirt called "Sinister Bunny" (I have one and get compliments on it all the time) I would rather support the imitated and not the duplicated and will be switching my bunny allegiance to you guys. Psycho Bunny is SICK! Like poison-;).

Like · Comment

1    2

Psycho Bunny likes this.

Psycho Bunny We know about this. We are a little unsure what we think ... flattered, offended, etc. But thank you for the note, I do like to hear when people see it or get confused.



200 Park Avenue - 44ᵗʰ floor
New York, NY 10166

www.mishconnewyork.com

June 7, 2012

Direct Tel: 212-612-3262
Direct Fax: 212-612-3297
E-mail: James.McGuire@Mishcon.com

## CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FEDERAL EXPRESS

Hilary Krane, Esq.
Vice President & General Counsel
Nike, Inc.
One Bowerman Drive
Beaverton, Oregon 97005

      Re:    Cease and Desist

Dear Ms. Krane:

This Firm represents God, Gold & Moore LLC, d/b/a Psycho Bunny ("Psycho Bunny"), and related entities.

Psycho Bunny is a retailer of clothing, bags, and accessories featuring the distinctive Psycho Bunny mark. Psycho Bunny sells its products both online through its website (www.psycho-bunny.com) as well as in retail establishments throughout the United States, Latin America, Asia, and Europe, including through Neiman Marcus, Barneys, and other well-known proprietors.

United States Trademark 3,790,282 protects the Psycho Bunny mark. Annexed at Tab A is a copy of the USPTO Trademark Electronic Search System's record of the Psycho Bunny design trademark.

It has come to our attention that Nike, Inc. ("Nike") is marketing a line of products under the so-called "Sinister Hare" brand featuring a substantially -- and confusingly -- similar design to that of the distinctive Psycho Bunny mark. Annexed at Tab B is a screen capture from Nike's website depicting its "Sinister Hare" brand of apparel. Perhaps you were unaware of this problem; in any event, it is in our clients' mutual interests to bring it to your attention.

Psycho Bunny has been using its mark in commerce since 2005. The mark has become a recognized feature of Psycho Bunny's products, and, in and of itself, identifies them as originating from the company. Nike's "Sinister Hare" brand is confusingly similar to the Psycho Bunny mark and, we believe, not only infringes but also dilutes that mark. Indeed, Psycho Bunny has already received communications from customers and business associates confused

Switchboard: +1 212 612 3270
Main Fax: +1 212 612 3297

New York: Mishcon de Reya New York LLP
London: Mishcon de Reya Solicitors

A list of partners is available for inspection at the above address

by the Sinister Hare brand and mistakenly believing that Psycho Bunny had partnered with Nike to create the new line of apparel. Moreover, Psycho Bunny is concerned that owing to the substantial likelihood of confusion here, its mark may be tarnished because of certain facial features exhibited in the "Sinister Hare" design possibly offensive to its Asian-market customers.

As you know, federal law protects the Psycho Bunny mark. In these premises, our clients possess certain concomitant rights, including that to restrict the use of its trademark or a confusingly similar trademark in association with confusingly similar products or services. Owing to the substantial similarity between the Psycho Bunny mark and Nike's "Sinister Hare" design, as well as the consequent threat posed to Psycho Bunny's trademark and business, we hereby demand that Nike immediately:

1. Cease and desist all use of the "Sinister Hare" design;

2. Deliver-up for destruction all material and products to which the "Sinister Hare" design has been applied;

3. Withdraw, cancel, and/or delete any corporate names, domain names, trademark applications, and/or trademark registrations for or including the "Sinister Hare" design; and

4. Undertake, in writing, never in the future to make any use of the "Sinister Hare" or any other design similar to the Psycho Bunny mark absent prior written authority from Psycho Bunny.

Please respond to this letter within ten (10) calendar days stating your intention to cease and desist use of the "Sinister Hare" design, as demanded herein. We sincerely hope that this matter can be resolved without judicial intervention. Feel free to contact me at the above coordinates, if you would like to discuss this matter.

This letter and demand are without prejudice to the rights of our clients, all of which are hereby expressly reserved.

Sincerely,

James J. McGuire

cc: Robert Godley
Robert Goldman

TAB A



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Jun 7 04:35:46 EDT 2012*

Logout Please logout when you are done to release system resources allocated for you.



### Record 1 out of 1

TARR Status | ASSIGN Status | TTAB Status | ( Use the "Back" button of the Internet Browser to return to TESS)



| Goods and Services | IC 025. US 022 039. G & S: Bow ties; Canvas shoes; Dress shirts; Golf shirts; Leather shoes; Polo shirts; Running shoes; Sandals; Shirts; Shirts for suits; Short-sleeved or long-sleeved t-shirts; Short-sleeved shirts; Sport shirts; Sweat shirts; T-shirts; Ties ; Track and field shoes; Training shoes. FIRST USE: 20060717. FIRST USE IN COMMERCE: 20060717 |
| --- | --- |
| Mark Drawing Code | (2) DESIGN ONLY |
| Design Search Code | 02.11.10 - Bones, human; Human skeletons, parts of skeletons, bones, skulls; Skulls, human<br>03.09.01 - Bunnies; Hares; Rabbits<br>03.09.24 - Stylized small mammals, rodents, kangaroos, wallabies<br>26.11.21 - Rectangles that are completely or partially shaded |
| Trademark Search Facility Classification Code | ANI-MAMM Mammals;accurate depiction of warm-blooded animals except for human beings<br>GROT-ANI Exaggerated depiction of an animal<br>HUM Accurate representation of a human form, or any portion of a human form<br>SHAPES-GEOMETRIC Geometric figures and solids including squares, rectangles, quadrilaterals and polygons |
| Serial Number | 78631437 |

| Filing Date | July 17, 2006 |
| Current Basis | 1A |
| Original Filing Basis | 1A;1B |
| Published for Opposition | July 10, 2007 |
| Registration Number | 3780282 |
| International Registration Number | |
| Registration Date | 0983867 |
| Owner | May 18, 2010 |
| | (REGISTRANT) RG2 LLC LIMITED LIABILITY COMPANY NEW JERSEY 120 LITTLE STREET BELLEVILLE NEW JERSEY 07109 |
| Assignment Recorded | ASSIGNMENT RECORDED |
| Attorney of Record | Oren J. Warshavsky |
| Description of Mark | Color is not claimed as a feature of the mark. The mark consists of A stylized skull with rabbit ears and two buck-teeth over two stylized crossed bones. . |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | SEARCH OG | | |

# TAB B





**For Settlement Purposes**
**Subject to FRE 408**

July 3, 2012

James McGuire
Mishcon de Reya New York LLP
200 Park Avenue – 44th Floor
New York, NY 10166
James.McGuire@mishcon.com

RE: Response to letter of June 7, 2012

Dear Mr. McGuire:

I write in response to your June 7, 2012 letter to Hilary Krane of Nike, Inc. regarding trademark registration no. 3,790,282. We note the cited registration appears to be owned by RG2 LLC. However, your letter was sent on behalf of God, Gold and Moore LLC. Please provide an explanation as to why you believe your client has the right to enforce any alleged rights under this registration and confirmation of the same.

Notwithstanding the question of your client's standing to enforce the cited registration, Nike takes the rights of third parties rights seriously. Accordingly, we have conducted an investigation into this matter. Based on our review, we do not believe Nike's use of the "Sinister Hare" graphic design on tees constitutes trademark use, much less a use that would create the likelihood of consumer confusion between it and the "Psycho Bunny" design mark.

As an initial matter, Nike's use of the "Sinister Hare" design on tees is a purely ornamental, non-trademark use. The hare design is only used in the center front of the "Sinister Hare" shirt, in a location which is typically the location of an ornamental design on tees. Additionally, the design is not used on hang tags, labels or other traditional trademark locations. In contrast, Nike uses several famous Nike-related marks, including the word NIKE and the Swoosh mark, in the traditional trademark locations. The "Sinister Hare" shirt is not a brand, as stated in your letter, but merely a style name referencing the design on the shirt. Nike's "Sinister Hare" design is merely aesthetic ornamentation which does not act as an identifier of the source of Nike's goods.

Further, in reviewing the Psycho Bunny design mark, we note that there are a number of similar marks containing variants of a rabbit (or rabbit related creatures, such as bunnies or hares) design with skulls or crossbones registered in the U.S. within international class 25. Moreover, there are numerous uses of a stylized rabbit or bunny head along with crossbones existing in the marketplace on tees, stickers, pins and other novelty merchandise. All of these third-party uses and registrations of the apparently common rabbit head and crossbones design indicate a crowded field and that each particular mark will only be accorded a limited scope of protection.

The significant differences in the features of Nike's ornamental design and the Psycho Bunny logo, particularly in light of the limited scope of protection afforded to rabbit and cross-bone designs, leads to the conclusion that there would be no likelihood of consumer confusion. In particular, the Psycho Bunny mark appears to be a common skull-and-crossbones design with rabbit ears connected to the skull. In contrast, Nike's ornamental design is not merely a slight variation on the centuries-old skull-and-crossbones design. Nike's design instead includes a stylized, live hare wearing running garments, such as a headband and running singlet. All of these features are references to running and/or speed. Further, the obscured bones and "angry" eyes allude to a sinister or aggressive stance. This combination of elements evokes Nike's running heritage, which is the commercial impression separate from the Psycho Bunny mark. Due to the differences between the designs and the commercial impressions thereof, there is no likelihood of consumer confusion as to the source of goods sold with these designs.

Moreover, there are several other factors which negate any possible likelihood of consumer confusion. Nike is not aware of any actual confusion of the source of Nike's goods bearing this design, and although your letter claims there has been confusion, you do not provide any such evidence. Further, as you noted in your letter, Psycho Bunny products are sold in high-end boutique stores such as Barneys and Neiman Marcus. In contrast, Nike's Sinister Hare tees are sold through sporting-goods stores and retailers of running clothing, and thus the channels of trade are quite different from those of Psycho Bunny.

We trust that this information will satisfy your client that Nike's "Sinister Hare" design on their running tee is ornamental, non-trademark use and is not likely to cause consumer confusion as to the source of these tees due to the prominent Nike branding on these shirts. If you would like to discuss this further, please do not hesitate to contact me at 503-671-2695 or per.enfield@nike.com.

Sincerely,

Per Enfield
Contract Attorney

**Exhibit H**



Our Ref:  88887.1

200 Park Avenue - 44th floor
New York, NY 10166

www.mishconnewyork.com

Direct Tel:  212-612-3262
Direct Fax:  212-612-3297
E-mail:  James.McGuire@Mishcon.com

July 6, 2012

<u>CERTIFIED MAIL RETURN RECEIPT REQUESTED</u>
<u>AND E-MAIL</u>

Per Enfield, Esq.
Contract Attorney
Nike, Inc.
One Bowerman Drive
Beaverton, Oregon 97005

> Re:    Cease and Desist

Dear Mr. Enfield:

We have received your July 3, 2012 letter in response to the June 7, 2012 "Cease &
Desist" letter of our client, God, Gold & Moore LLC ("God, Gold & Moore" d/b/a "Psycho
Bunny"), to Nike, Inc. ("Nike"). Nike's stated positions on relevant points are disappointing
and, we believe, flawed for a variety of reasons.

To begin, as indicated in the Cease & Desist letter, we represent God, Gold & Moore
"and its related entities," including RG2 LLC, the registered rights holder to the marks at issue.
Your challenge to God, Gold & Moore's "standing" was surprising, since Nike has more than
some familiarity with that company as well as its principals, Robert Godley and Robert
Goldman, who lend their initials in-tandem to RG2 LLC. Be assured that Messrs. Godley and
Goldman, together with their entities, have the right to protect the Psycho Bunny trademarks
Nike is currently infringing.

Next, your attempt to insulate Nike's use of the "Sinister Hare" design from trademark
infringement as "purely ornamental, non-trademark use" omits, among other things, the critical
fact that said use incorporates Nike's swoosh-mark and moniker. As such, the average consumer
is likely to recognize the design as a Nike product, making it an indicator of source <u>not</u> mere
decoration. See <u>Gucci Am., Inc. v. Guess?, Inc.</u>, 09 CIV. 4373 SAS, 2012 WL 2304247, *24
(S.D.N.Y. June 18, 2012) ("A feature is ornamental if it is added purely for aesthetic reasons and
serves no source-identifying purpose."); <u>Aris-Isotoner Gloves, Inc. v. Fownes Bros. & Co., Inc.</u>,
594 F. Supp. 15, 22 (S.D.N.Y. 1983) ("If it serves as an identification of source it is a trademark,
regardless of whether it is also attractive."). Indeed, the description of the "Sinister Hare" design

Legal1tem.649483
Switchboard: +1 212 612 3270      New York: Mishcon de Reya New York LLP      A list of partners is available for
Main Fax    +1 212 612 3297       London:   Mishcon de Reya Solicitors         inspection at the above address



in your letter -- as intended to "evoke[] Nike's running heritage" -- also highlights Nike's intent that "Sinister Hare" be a source identifier, rather than mere decoration. In any event, Nike's purported defense is so highly fact specific that you must recognize it will be subject to great scrutiny during discovery, should litigation ensue.

In addition, and contrary to your assertion -- significant factual research reveals that, under any reasonable view, the "field" inhabited by the Psycho Bunny mark is not "crowded." To the contrary, there are but a few trademarks involving a stylized rabbit head with underlying cross-bones. Those that do exist are currently subject to our client's enforcement efforts. In these premises, Nike's claim that the Psycho Bunny mark may not be afforded the full protection that it would otherwise have is untenable. See Nabisco v. Warner-Lambert Co., 32 F. Supp. 2d 690, 698 (S.D.N.Y. 1999) aff'd sub nom. Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43 (2d Cir. 2000) (crowded field, where defendant documented over 36 uses of term "Ice" in field; for crowded field to pertain, "extensive third party use" must exist); Mondo, Inc. v. Sirco Int'l Corp., 97 CIV. 3121 MBM, 1998 WL 849401, *6 (S.D.N.Y. Dec. 7, 1998) (trademark weakened by third-party use, where more than 20 similar trademark applications and registrations existed). If, however, you have evidence that supports Nike's "crowded field" theory, please disclose and turn it over to us for careful review.

Moreover, the fact that Nike's infringing apparel may not be sold in the same high-end boutique stores where Psycho Bunny products are sold is irrelevant to the issue of consumer confusion. See adidas-America, Inc. v. Payless Shoesource, Inc., 546 F. Supp. 2d 1029, 1054-55 (D. Ore. 2008) (similar marketing channels lead to consumer confusion, despite product sales through different retail outlets; even if marketing channels different, possibility of post-sale confusion still exists). Both Nike and Psycho Bunny use their respective designs on shirts sold in traditional brick-and-mortar stores and through Internet outlets. Moreover, our clients understand Nike to be planning an expansion of the "Sinister Hare" line of products by, among other things, introducing it with other apparel as well as expanding its sales into additional markets where the Psycho Bunny mark already trades. Such an expansion will only exacerbate the significant confusion extant in the marketplace.

Finally, we note that your letter completely omits any explanation for the strikingly similar name Nike chose for its infringing design. Who could responsibly deny that Nike chose a name ("Sinister Hare") confusingly similar to "Psycho Bunny" -- itself is a registered and protected word mark (Reg. No. 3750802) -- to label a design also confusingly similar to the Psycho Bunny design mark? In actuality, it is Nike's grossly obvious play-on-words coupled with its near identical design that has fomented the already substantial confusion in the marketplace to the meaningful detriment of our clients' "Psycho Bunny" marks.



Accordingly, we renew our clients' demand that Nike cease and desist using the "Sinister Hare" design in accordance with my letter of June 7, 2012. Should you wish to discuss this matter further, or if you have any additional specific evidence supporting Nike's positions on key issues, please contact me at the above coordinates.

This letter and demand are without prejudice to the rights of our clients, all of which are hereby expressly reserved.

Sincerely,

James J. McGuire

cc:     Mr. Robert Godley
        Mr. Robert Goldman
        Vincent Filardo, Jr., Esq.

Exhibit I

**For Settlement Purposes**
**Subject to FRE 408**

August 6, 2012

James McGuire
Mishcon de Reya New York LLP
200 Park Avenue – 44th Floor
New York, NY 10166
James.McGuire@mishcon.com

          **RE: Response to Cease and Desist**

Dear Mr. McGuire:

I write in response to your follow-up letter of July 6, 2012.

Despite your protestations to the contrary, Nike continues to maintain that the "Sinister Hare" design does not infringe any rights of your clients or "its related entities." In particular, although Nike's shirt design incorporates Nike's famous marks, the design itself does not serve a source identifying function. Additionally, there are a number of rabbit-and-crossbones designs which are registered and/or in use in the marketplace, which restrict the scope of protection for your client's mark. Further, we again note the substantial differences between Nike's design and your client's mark, which you failed to address in your July 6 response. Even based on these limited factors, which are not intended as an exhaustive analysis of this matter, there is simply no infringement of your client's rights.

As an initial matter, the mere incorporation of Nike's famous Swoosh Design and NIKE mark into the Sinister Hare ornamentation does not make the entirety of the design a source identifier. In this situation, the Swoosh Design and NIKE mark are the source identifiers, while the Sinister Hare design is ornamentation added purely for aesthetic reasons. The Nike marks are incorporated into the design on products, namely a headband and a running singlet, which are offered by Nike. As such, there is a clear distinction between the indicia of source in the design and the design itself. The Sinister Hare design is no more an identifier of source due to the incorporation of Nike marks than the "Don't Tread On Me" design (attached hereto) is a source identifier for Nike due to the Swoosh design incorporated into that image. In fact, the addition of the Nike marks reduces the likelihood of confusion with your client's mark. See *W.W.W. Pharm. Co v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993) ("when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened"), cited in *Nabisco, Inc.*, which was referenced in your letter.

Turning to the field of rabbit and crossbones marks, as noted previously there are a number of third-party users and registrants for similar designs. In particular, as non-exhaustive examples, we note registrations

for  (Reg. No. 3,956,425),  (Reg. No. 3,802,397),  (Reg. No.

3,673,457) and ![bunny] (Reg. No. 3,304,337), all in Class 25. Additionally, we note two

registrations for ![bunny crossbones] (Reg. Nos. 3616210 and 3864326) for goods in class 25 and other related classes. Further, the bunny and crossbones mark is used by Love Rabby as a stand-alone design. Moreover, there are numerous uses of a stylized rabbit or bunny head along with crossbones existing in the marketplace on tees, stickers, pins and other novelty merchandise. These third-party uses of rabbit and crossbones, and in particular with obscured crossbones as in Nike's design, show both that there is a crowded overall field and that subtle differences in the designs are sufficient to distinguish the marks in this field.

In this respect, the significant differences in the features of Nike's design and the Psycho Bunny logo, clearly leads to the conclusion that there is no likelihood of consumer confusion. As noted previously, Nike's design includes a stylized live hare wearing Nike-branded running garments. While these elements evoke Nike's running heritage, the design elements (other than Nike's trademarks) are not exclusive to Nike nor would they solely identify Nike as the source of goods bearing this design. Additionally, the crossbones in Nike's design are obscured by a running singlet, unlike your client's mark. Even without the third-party use of similar designs, the differences between Nike's design and your client's mark are sufficient to avoid any consumer confusion.

In regards to your inquiry regarding the style name "Sinister Hare", the origin of the name was discussed in our prior correspondence – the style name merely describes the characteristics of the Sinister Hare design. Specifically, "sinister" was chosen in reference to the angry, aggressive eyes given to the design. Further, "hare" is in reference to the animal depicted in the design and evokes the image of speed – e.g., the tortoise and the hare. Both aggressiveness and speed are desirable traits in running and create a favorable impression on the target consumer of Nike's Sinister Hare style. Thus, Nike chose this descriptive name for the Sinister Hare style. As "psycho" and "sinister" are not synonymous or even similar, and there are only a limited number of ways to describe a member of the family leporidae, the claim that Nike's style name is somehow a play on your client's word-mark fails.

We note you continue to claim that there is "substantial" confusion in the marketplace. However, despite our prior request, you have yet to provide any evidence of such confusion. If you possess any such evidence, please provide us with this evidence for our consideration.

Due at least in part to the foregoing, Nike maintains that there is no likelihood of confusion as to the source of goods bearing Nike's Sinister Hare ornamentation and your client's trademark. If you would like to discuss this further, please do not hesitate to contact me at 503-671-2695 or per.enfield@nike.com.

This letter is without prejudice to any claims or defenses Nike may have in respect to this matter, each of which is expressly reserved.

Sincerely,

Per Enfield
Contract Attorney

